**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | **MISC. NO. ____** |
| **v.** | **:** | |
| | **:** | **Filed Under Seal** |
| **SUSAN ENGONWEI TINGWEI,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT**

**I.      IDENTITY OF THE AFFIANT**

I, Jynika Craig, being duly sworn, state:

1.      I am a Special Agent of the Federal Bureau of Investigation ("FBI"). From 2015 to the present, I have been assigned to a white-collar crime squad at the FBI's Washington Field Office in the District of Columbia, specifically focused on the investigation of health care fraud and other health care crimes. My investigative focus during the past two years has been on fraud against government programs. I have received training in general law enforcement and criminal investigations, and I have attended training programs focused on health care crimes. I have investigated allegations of health care fraud, false claims, and money laundering.

2.      I am assigned to this investigation and my involvement has included, but is not limited to, interviewing witnesses, reviewing Medicaid billing claims and medical records associated with Medicaid recipients, as well as conducting surveillance.

**II.      REASON FOR AFFIDAVIT**

3.      This affidavit is made in support of a criminal complaint and arrest warrant charging SUSAN ENGONWEI TINGWEI ("TINGWEI") with violations of 18 U.S.C. § 1347 (Health Care Fraud) and 18 U.S.C. § 1035 (Health Care False Statements).

1

4.     TINGWEI resides in Silver Spring, Maryland.  From at least January 1, 2015 through on or about September 9, 2018, TINGWEI was employed as a Personal Care Aide ("PCA") providing home health services to residents of the District of Columbia who received Medicaid. TINGWEI used a unique National Provider Identifier ("NPI") Number to submit timesheets to home health agencies ("HHA"), which in turn billed Medicaid and paid TINGWEI.

5.     In or around October 2015, the FBI, the Department of Health & Human Services, Office of Inspector General ("HHS-OIG"), and the D.C. Medicaid Fraud Control Unit ("MFCU") opened an investigation into allegations surrounding one of the HHAs ("HHA-1") that employed TINGWEI as a PCA. HHA-1 was alleged to have defrauded the D.C. Medicaid program by submitting and causing to be submitted false claims concerning the provision of PCA services.

6.     During the course of the investigation into HHA-1, law enforcement identified TINGWEI as a PCA who submitted false claims under the name SUSAN TINGWEI using the NPI number ending in 4442.  The false claims can be categorized broadly as claims purporting that TINGWEI provided services to Medicaid beneficiaries to whom she provided no care at all and claims purporting that TINGWEI provided services when it would be impossible to do so.

7.     The claims data further shows that, at various times during the period of January 1, 2015 through September 9, 2018, TINGWEI was employed by approximately four HHAs:  HHA-1 through HHA-4 (collectively the "four HHAs").  The four HHAs were registered to do business in the District of Columbia to provide home health care services to Medicaid beneficiaries. TINGWEI purported to provide PCA services for six Medicaid beneficiaries during this time period.

8.     During the course of the investigation, law enforcement discovered that TINGWEI was enrolled in the Master of Laws program at the University of Maryland ("UMD"), Francis King

Carey School of Law, located in Baltimore, Maryland, from August 2016 to May 2017. TINGWEI was enrolled in eleven courses. She completed thirteen credit hours during the Fall 2016 semester and seventeen credit hours during the Spring 2017 semester. These courses were held at the law school. TINGWEI was awarded the Master of Laws degree on May 19, 2017.

9.     The facts and information contained in this affidavit are based on my personal knowledge of the investigation and the observations and reports of other law enforcement officers. This affidavit is not intended to include each and every fact and matter observed by me or known to the government relating to the subject matter of this investigation. Instead, this affidavit contains only those facts, which are necessary to establish that probable cause exists.

### III.     OVERVIEW OF DISTRICT OF COLUMBIA MEDICAID PROGRAM AND HOME HEALTH CARE SERVICES

10.     Medicaid is a "health care benefit program" as defined by 18 U.S.C. § 24(b). It was established by Congress under Title XIX of the Social Security Act of 1965 (the "Medicaid Act"). Medicaid was overseen and administered by the Centers of Medicare and Medicaid Services ("CMS"), an agency within HHS. The federal government provides the funding for 70 to 80 percent of Medicaid, and the District provides the remaining funds. Through September 30, 2008, Medicaid was administered by the D.C. Department of Health's Medical Assistance Administration; however, since October 1, 2008, Medicaid has been administered by the Department of Health Care Finance ("DHCF"), which is located in Northwest Washington, D.C.

11.     D.C. Medicaid provides health insurance coverage to residents of the District of Columbia whose incomes are below a certain financial threshold as measured against the poverty line. Recipients of medical services covered by Medicaid are referred to as "beneficiaries." In the District of Columbia, a beneficiary is assigned a D.C. identifier ("DCID"), a unique eight-digit number that is used to bill Medicaid for services provided to the beneficiary.

12.     In the District of Columbia, HHAs can provide certain services including skilled nursing, home health aide, and personal care services. Personal care services are intended to assist Medicaid beneficiaries in performing the activities of daily living, known as "ADLs." ADLs include the ability to get in and out of bed, bathe, dress, eat, take medication prescribed for self-administration, and engage in toileting.

13.     To be eligible to participate in Medicaid, HHAs must agree to abide by all federal and local laws, regulations, and program manuals governing Medicaid reimbursements. To receive reimbursement from Medicaid, HHAs operating in the District of Columbia are required to submit a claim, either electronically or in paper form, to DHCF. As part of the claim, an HHA must provide certain information, such as the name of the Medicaid beneficiary, the date of service, the type of service and corresponding billing code, the amount of time a service was provided, and the amount of money being claimed by the HHA as payment from Medicaid. Medicaid only pays for services that are medically reasonable and necessary, and that are actually provided as claimed.

14.     HHAs employ and contract with personal care aides to provide services to Medicaid beneficiaries. Under the Medicaid rules, a PCA must meet certain qualifications, including: (a) being at least 18 years of age; (b) being a citizen of the United States or an alien who is lawfully authorized to work in the United States; (c) completing a home health aide training program that involves at least seventy-five hours of classroom training with at least sixteen hours devoted to supervised practical training; (d) passing a competency evaluation for the services which the PCA is required to perform consistent with the requirements set forth in 42 C.F.R. § 484.36; (e) obtaining certification in cardiopulmonary resuscitation and maintaining such certification annually; (f) demonstrating that the PCA is free from communicable disease as confirmed by an annual PPD Skin Test or documentation from a primary care physician stating that the person is

free from communicable disease; and (g) passing a criminal background check. PCAs are issued a unique 10-digit NPI number, which the HHA uses to bill Medicaid for services rendered to a beneficiary based on timesheets submitted by the PCA.

15.     To receive personal care services under Medicaid, a beneficiary must obtain a prescription from a doctor, informally known as an "intake." Medicaid only pays for personal care services if the doctor determines after a face-to-face physical examination that the beneficiary has functional limitations in one or more ADLs. DHCF regulations that went into effect in November 2013 clarified that the doctor prescribing the intake must be the beneficiary's primary care physician with whom the beneficiary had a pre-existing doctor-patient relationship.

16.     A beneficiary takes the intake to an HHA, which in turn arranges for a registered nurse to perform an initial assessment of the beneficiary's functional status and needs. The nurse drafts a Plan of Care ("POC") for the beneficiary based on the assessment. The POC is required to specify the frequency, duration, and expected outcome of the personal care services and is supposed to be tailored to address the individual needs of the beneficiary.

17.     The HHA then assigns a PCA to provide the personal care services set forth in the POC to the beneficiary. Services typically are provided in the beneficiary's home and PCAs must document the provided care on a timesheet that is submitted to the HHA. The timesheet is supposed to reflect accurately the date the PCA provided services, the itemized services rendered, the amount of time spent providing each service, and the location at which the services were provided. Timesheets are supposed to be signed each day by both the PCA and the beneficiary. However, a single timesheet can contain a full week of services. HHAs use the timesheets to determine and justify the hours of services for which the HHA files a reimbursement claim with Medicaid.

18.     As outlined in Section 6.3, Interrelationship of Providers, of the D.C. Medicaid MMIS Provider Billing Manual, "Providers are prohibited from referring or soliciting beneficiaries directly or indirectly to other providers for financial consideration. Providers also are prohibited from soliciting, receiving or offering kickbacks; payments, gifts, bribes, or rebates for purchasing; leasing, ordering, arranging for, recommending purchasing, leasing; ordering for goods, facilities, or items for which payment is made through the D.C. Medicaid Program."

## IV.     FACTS SUPPORTING PROBABLE CAUSE

19.     As mentioned above, the investigation has revealed that TINGWEI submitted or caused to be submitted false timesheets to HHAs for payment of PCA services not rendered to beneficiaries. The HHAs subsequently sought and received payments from D.C. Medicaid based on TINGWEI's fraudulent timesheets.

20.     During the course of the investigation, law enforcement obtained, *inter alia*, TINGWEI's HHA employment records; patient files; UMD records, including a key card log of entry and exit times for the UMD key card associated with TINGWEI; patient files; D.C. Medicaid billing claims submitted with her NPI number; and phone records for TINGWEI's cellular phone number XXX-XXX-1613, which included cell tower location for activity between April 1, 2017, through June 1, 2017.  Law enforcement also interviewed witnesses and TINGWEI. In addition, law enforcement conducted surveillance on TINGWEI during hours that she purported to provide PCA services.

### A.  Overlapping Hours

21.     The investigative team compared TINGWEI's HHA timesheets with her UMD law school course schedule to determine the hours that she was supposed to be present in class. The analysis found that on approximately 118 occasions, during the period of approximately August

22, 2016 through May 11, 2017, TINGWEI submitted timesheets claiming that she worked as a PCA in the District of Columbia during the same hours when she either was scheduled to attend law school courses at UMD or should have been traveling to or from Baltimore related to her law school program.   During these approximate 118 occasions, TINGWEI consistently submitted timesheets claiming to have provided PCA services to two different Medicaid beneficiaries, working on average, a total of thirteen hours a day as a PCA. D.C. Medicaid claims data confirms that HHAs billed D.C. Medicaid for TINGWEI's purported PCA services.

22.     TINGWEI's fraudulent Medicaid claims are too numerous to recite in full in this Affidavit.   However, for purposes of establishing probable cause, the exemplars set forth in paragraphs 23 through 28 provide non-exhaustive examples of her fraud scheme.

23.     For example, TINGWEI caused D.C. Medicaid to be billed for 52 units (or 13 hours) of PCA services that she allegedly provided on April 3, 2017, to B-1 and B-2, who lived together in the District of Columbia.   TINGWEI's timesheets showed her as providing PCA services to B-1 from 7:00 AM to 3:00 PM and to B-2 from 3:30 PM to 8:30 PM on that day. TINGWEI's law school schedule indicated that she had two courses scheduled that day, one from 3:15 PM to 4:30 PM and the other from 6:30 PM to 8:30 PM. TINGWEI's phone records placed her in Baltimore on April 3, 2017, from approximately 1:00 PM to 4:40 PM and in the Silver Spring area from approximately 5:06 PM to 9:42 PM.  Table 1 further illustrates details gathered from the review of TINGWEI's timesheets, D.C. Medicaid claims data, and UMD records from April 3, 2017.

| TABLE 1 | | | | | | |
|---|---|---|---|---|---|---|
| Date | Beginning Time | End Time | HHA/UMD | Beneficiary | Hours of Work Claimed | Amount Paid to HHA |
| **April 3, 2017** | 7:00 AM | 3:00 PM | HHA-2 | B-1 | 8 | $161.60 |
| **April 3, 2017** | 3:30 PM | 8:30 PM | HHA-3 | B-2 | 5 | $101.00 |
| **April 3, 2017** | 3:15 PM | 4:10 PM | UMD Course | N/A | N/A | N/A |
| **April 3, 2017** | *6:30 PM[1]* | *8:30 PM* | *UMD Course* | *N/A* | *N/A* | *N/A* |
| | | | | | | |
| **Total** | | | | | 13 | $262.60 |

24.    As an additional example of her fraudulent conduct, TINGWEI caused D.C. Medicaid to be billed for 20 units (or 5 hours) of PCA services that she purportedly provided to B-2 on April 12, 2017.  A review of the timesheets submitted by TINGWEI shows that she allegedly provided PCA services to B-2 during the hours of 3:30 PM to 8:30 PM.  UMD records indicate that TINGWEI had a law school course scheduled on April 12, 2017 from 6:30 PM to 9:35 PM.  In addition, UMD key card log records show TINGWEI's key card as being swiped on campus at approximately 4:37 PM and later swiped at an exit gate at approximately 8:00 PM.  Moreover, general location data from TINGWEI's phone records place TINGWEI in Baltimore on this day from approximately 4:43 PM to 8:02 PM.  Table 2 further illustrates details gathered from the review of TINGWEI's timesheets, D.C. Medicaid claims data, and UMD records from April 12, 2017.[2]

---

[1] Based on the T-Mobile information regarding the location of TINGWEI's cell phone, I do not believe she attended a 6:30 PM class on April 3, 2017. The UMD key log records do not include information about TINGWEI using her key card on this day.

[2] TINGWEI also purported to provide eight hours of PCA services to B-1 on April 12, 2017, from 7:00 AM until 3:00 PM, for which Medicaid issued HHA-2 a payment of $161.60. T-Mobile records show TINGWEI's cell phone as being located in Silver Spring, Maryland, that day at, among other times, approximately 7:11 AM, 8:32 AM, 9:31 AM, 10:58 AM, 12:02 PM, 12:32 PM, 2:30 PM, and 3:37 PM, i.e., when she could not also have been at B-1's D.C. residence.

| TABLE 2 | | | | | | |
|---|---|---|---|---|---|---|
| Date | Beginning Time | End Time | HHA/UMD | Beneficiary | Hours of Work Claimed | Amount Paid to HHA |
| **April 12, 2017** | 3:30 PM | 8:30 PM | HHA-3 | B-2 | 5 | $101.00 |
| **April 12, 2017** | 4:37 PM | 8:00 PM | UMD Key Log | N/A | N/A | N/A |
| **April 12, 2017** | *6:30 PM[3]* | *9:35 PM* | *UMD Course* | *N/A* | *N/A* | *N/A* |
| | | | | | | |
| **Total** | | | | | 5 | **$101.00** |

25.     TINGWEI also caused Medicaid to be billed for PCA services she allegedly provided to B-1 and B-2 on April 13, 2017, April 24, 2017, and April 25, 2017. On all three dates, her timesheets show her providing PCA services to B-1 from 7:00 AM to 3:00 PM and to B-2 from 3:30 PM to 8:30 PM.

a.     On April 13, 2017, she had two law school classes scheduled, one from noon to 12:55 PM and the other from 6:30 PM to 9:35 PM. UMD key card log records show TINGWEI's key card being swiped on campus at 5:30 PM and swiping out at 9:29 PM. Moreover, cell phone records show TINGWEI's cell phone being in Baltimore on that date at, among other times, approximately 8:03 AM, 8:53 AM, 12:00 PM, 1:03 PM, 1:32 PM, 2:08 PM, 2:53 PM, 5:04 PM, 6:08 PM, 7:22 PM, 8:41 PM, and 9:31 PM.

b.     On April 24, 2017, TINGWEI had law school courses scheduled for 3:15 PM to 4:10 PM and 6:30 PM to 8:30 PM. UMD key card log records show TINGWEI's key card being on campus at 4:07 PM and swiping out at 10:33 PM. Cell phone records show TINGWEI's cell phone being in Baltimore that day at, among other times, approximately 4:16 PM, 6:07 PM, and 10:33 PM.

c.     On April 25, 2017, TINGWEI had law school courses scheduled from 12:00 PM to 2:00 PM, 2:10 PM to 4:10 PM, and 6:30 PM to 8:30 PM. Moreover, UMD key card log records

---

[3] Based on the T-Mobile phone records and UMD key card log, I do not believe TINGWEI attended class after 8:00 p.m. on April 12, 2017.

show TINGWEI's key card being on campus at 4:49 PM and swiping out at 10:17 PM. Cell phone

records show TINGWEI's cell phone being in Jessup, Maryland, at approximately 4:15 PM; Jessup

is approximately 15 miles from Baltimore. The records also show her cell phone being in Baltimore

at, among other times, approximately 5:51 PM, 6:18 PM, 9:36 PM, and 10:16 PM.  Table 3 further

illustrates details about her fraud on this date, as well as April 13 and April 24.

| TABLE 3 | | | | | | |
|---|---|---|---|---|---|---|
| Date | Beginning Time | End Time | HHA/UMD | Beneficiary | Hours of Work Claimed | Amount Paid to HHA |
| **April 13, 2017** | 7:00 AM | 3:00 PM | HHA-2 | B-1 | 8 | $161.60 |
| **April 13, 2017** | *12:00 PM* | *12:55 PM* | *UMD Course* | *N/A* | *N/A* | *N/A* |
| **April 13, 2017** | 3:30 PM | 8:30 PM | HHA-3 | B-2 | 5 | $101.00 |
| **April 13, 2017** | 5:30 PM | 9:29 PM | UMD Key Log | N/A | N/A | N/A |
| **April 13, 2017** | 6:30 PM | 9:35 PM | UMD Course | N/A | N/A | N/A |
|  |  |  |  |  |  |  |
| **April 24, 2017** | 7:00 AM | 3:00 PM | HHA-2 | B-1 | 8 | $161.60 |
| **April 24, 2017** | *3:15 PM* | *4:10 PM* | *UMD Course* | *N/A* | *N/A* | *N/A* |
| **April 24, 2017** | 3:30 PM | 8:30 PM | HHA-3 | B-2 | 5 | $101.00 |
| **April 24, 2017** | 4:07 PM | 10:33 PM | UMD Key Log | N/A | N/A | N/A |
| **April 24, 2017** | 6:30 PM | 8:30 PM | UMD Course | N/A | N/A | N/A |
|  |  |  |  |  |  |  |
| **April 25, 2017** | 7:00 AM | 3:00 PM | HHA-2 | B-1 | 8 | $161.60 |
| **April 25, 2017** | *12:00 PM* | *2:00 PM* | *UMD Course* | *N/A* | *N/A* | *N/A* |
| **April 25, 2017** | *2:10 PM[4]* | *4:10 PM* | *UMD Course* | *N/A* | *N/A* | *N/A* |
| **April 25, 2017** | 3:30 PM | 8:30 PM | HHA-3 | B-2 | 5 | $101.00 |
| **April 25, 2017** | 4:49 PM | 10:17 PM | UMD Key Log | N/A | N/A | N/A |
| **April 25, 2017** | 6:30 PM | 8:30 PM | UMD Course | N/A | N/A | N/A |
|  |  |  |  |  |  |  |
| **Total** |  |  |  |  | **39** | **$789.80** |

---

[4] Based on the T-Mobile phone records and UMD key card log, I do not believe TINGWEI attended the following classes: the 3:15 to 4:10 class on April 24, 2017; and the 12:00 PM to 2:00 P.M and 2:10 PM to 4:10 PM classes on April 25, 2017.

**B. Billing for Services Not Rendered while Under Surveillance**

26.     On April 20, 2017, law enforcement conducted surveillance of TINGWEI beginning at or around 5:49 AM and ending at or around 12:00 PM.  D.C. Medicaid claims data for April 20, 2017 revealed that TINGWEI caused D.C. Medicaid to be billed $161.60 for eight hours of PCA services she purportedly provided to B-1 and $101.00 for five hours she purportedly provided to B-2. Her timesheets asserted that she provided PCA services to B-1 from 7:00 AM to 3:00 PM and to B-2 from 3:30 PM to 8:30 PM. However, at or around 8:27 AM, TINGWEI was observed departing her residence in Silver Spring, Maryland, in a grey Hyundai that is registered to her[5] and ultimately arriving in Baltimore, Maryland at or around 9:31 AM.  At approximately 9:38 AM, TINGWEI was observed entering a parking garage in Baltimore. Shortly thereafter, TINGWEI was observed entering the University of Maryland School of Law building, located at 500 W. Baltimore Street, Baltimore, Maryland.[6]

27.     On May 15, 2017, law enforcement conducted surveillance of TINGWEI beginning at approximately 5:50 AM. D.C. Medicaid claims data for May 15, 2017 revealed that TINGWEI caused D.C. Medicaid to be billed $262.60 for thirteen hours of PCA services she purportedly provided to B-1 and B-2. TINGWEI's HHA timesheets for this date show her claiming to provide PCA services to B-1 from 7:00 AM to 3:00 PM and services to B-2 from 3:30 PM to 8:30 PM. At approximately 6:20 AM, TINGWEI was observed departing her residence in the silver Hyundai Accent that is registered to her. At approximately 7:12 AM, she arrived at the residence of B-1 and

---

[5] Vehicles registered to TINGWEI in the state of Maryland are a grey/silver Hyundai Accent, tag number ending in 798 and a black Mercedes SUV, tag number ending in 9M8.

[6] T-Mobile cell phone records show that, at approximately 9:31 AM, TINGWEI's cell phone made an outgoing call that hit off of a phone tower in Baltimore, Maryland.  Although law enforcement terminated its surveillance at 12:00 PM, T-Mobile records show TINGWEI's cell phone as being located in Baltimore at, among other times, 10:40 AM, 11:21 AM, 1:19 PM, 2:27 PM, 3:02 PM, 6:08 PM, 8:09 PM, 8:56 PM, and 11:39 PM.

B-2.  At approximately 8:43 AM, she left the residence and drove to HHA-2, located in Northeast Washington. She arrived at HHA-2 at approximately 9:10 AM. TINGWEI returned to her vehicle and departed HHA-2 at or around 9:14 AM.  At or around 9:33 AM, TINGEWI arrived at HHA-3, located in Northwest Washington, and shortly thereafter, returned to her vehicle and departed. From approximately 9:44 AM to 10:53 AM, TINGWEI was observed entering a number of business establishments located in Maryland. At approximately 11:20 AM, her vehicle was observed parked near TINGWEI's residence. At approximately 6:09 PM, TINGWEI was observed entering the vehicle with other occupants. The vehicle made one stop prior to arriving back at the residence of B-1 and B-2.  At or around 7:04 PM, TINGWEI was observed walking into the residence of B-1 and B-2 with one of the unidentified occupants of the vehicle.  At or around 7:16 PM, TINGWEI and the unidentified occupant returned to the vehicle and departed the residence of B-1 and B-2. Her vehicle was last observed on Gun Powder Road, Silver Spring, Maryland, at approximately 7:50 PM, at which time the surveillance was terminated.

28.     On May 16, 2017, law enforcement conducted surveillance on TINGWEI at her residence in Silver Spring, Maryland, beginning at approximately 5:52 AM. D.C. Medicaid claims data for May 16, 2017 revealed that TINGWEI caused D.C. Medicaid to be billed $262.60 for thirteen hours of PCA services she purportedly provided to B-1 and B-2. TINGWEI's HHA timesheets for this date show her claiming to have provided PCA services to B-1 from 7:00 AM to 3:00 PM and services to B-2 from 3:30 PM to 8:30 PM. At approximately 7:05 AM, TINGWEI departed her residence in her vehicle, and after a couple of stops in Takoma Park, Maryland and Silver Spring, Maryland, arrived at a parking garage located in Baltimore, Maryland at or around 9:37 AM.  At approximately 9:50 AM, TINGWEI entered the Southern Campus Center at UMD, located on Lombard Street in Baltimore. At approximately 10:55 AM, TINGWEI departed the

area and approximately thirty minutes later, arrived at a garage near 10026 Gorman Road, Laurel, Maryland.  At or around 11:46 AM, TINGWEI left the garage and drove to her residence, arriving at approximately 12:19 PM.  Law enforcement agents then observed her depart her residence with an unidentified man at approximately 7:08 p.m.  TINGWEI proceeded to an ATM at a Bank of America location in Silver Spring, Maryland.   At or around 7:40 PM, law enforcement last observed TINGWEI and the unidentified occupant at a Total Wine location in Laurel, Maryland.

### C.  Interviews of TINGWEI and B-1

29.     On October 24, 2016, TINGWEI was interviewed by your affiant. TINGWEI indicated she was the PCA for both B-1 and B-2, who resided together. TINGWEI stated she did not provide B-1 and B-2 PCA services at the same time because she could not work for two beneficiaries at the same time. TINGWEI provided that she missed visits but did not recall when and did not know how often. TINGWEI stated she never billed for hours she did not work, but if she was late to work, she did not adjust her timesheets to reflect her correct work hours. TINGWEI was unwilling to indicate whether or not the statements she made to your affiant during her interview were completely accurate.

30.     B-1 was interviewed on three separate occasions concerning the PCA services she received from TINGWEI and provided agents with inconsistent statements.  B-1 was inconsistent when questioned about how often TINGWEI came to work, whether or not TINGWEI was late to work or missed work, and if TINGWEI provided B-1 with money or gifts.  For instance, when interviewed on October 21, 2016, B-1 stated that TINGWEI worked her full eight hours and only came to work late on one occasion. However, on February 6, 2019, B-1 stated that TINGWEI only worked three to four days and at times would show up as late as 1:00 PM or 2:00 PM. B-1 also

said that on days that TINGWEI arrived late, TINGWEI did not adjust the timesheet and had B-1 sign the timesheet reflecting false hours.

### D.  Receipt of Payment for Services Billed

31.     A review of payroll records for the four HHAs where TINGWEI was employed reflect disbursements to TINGWEI of approximately $191,743.83 from the period of January 1, 2015 through September 28, 2018.

## V.     CONCLUSION

32.     Based on the foregoing facts and information gathered thus far in the investigation, I submit that there is probable cause that from on or about January 1, 2015 through on or about September 9, 2018, TINGWEI committed Health Care Fraud, in violation of 18 U.S.C. § 1347, and Health Care False Statements, in violation of 18 U.S.C. § 1035.

_____
Special Agent Jynika Craig
Federal Bureau of Investigation


Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 on June 22, 2020.


_____
Robin M. Meriweather
Magistrate Judge